[Cite as *State v. Bell*, 2013-Ohio-1303.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## SENECA COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLEE,                CASE NO.  13-12-27

      v.

DEMARIS D. BELL,                    **O P I N I O N**

      DEFENDANT-APPELLANT.

Appeal from Seneca County Common Pleas Court
Trial Court No. 11CR0254

**Judgment Affirmed**

**Date of Decision:  April 1, 2013**

APPEARANCES:

    *John M. Kahler, II* for Appellant

    *Derek W. DeVine and Rhonda L. Best*  for Appellee

**SHAW, J.**

{¶1} Defendant-appellant Demaris D. Bell ("Bell") appeals the June 6, 2012, judgment of the Seneca County Common Pleas Court sentencing Bell to an aggregate prison term of 32 months following a trial wherein a jury convicted bell of two counts of Trafficking in Cocaine, in violation of R.C. 2925.03(A)(1), (C)(4)(b), both felonies of the fourth degree due to the offenses occurring in the vicinity of a juvenile. For the reasons that follow, we affirm the judgment of the trial court.

{¶2} On May 10, 2011, the Seneca County Drug Task Force conducted two separate controlled drug buy operations in Room 32 of the Tiffin Motel in Tiffin, Ohio. A confidential informant, working with the task force, went to the motel and purchased cocaine on two separate occasions on May 10 from Bell while children were present.

{¶3} On November 16, 2011, Bell was indicted for two counts of Trafficking in Cocaine, in violation of R.C. 2925.03(A)(1),(C)(4)(b), both felonies of the fourth degree due to the offenses occurring in the vicinity of a juvenile.

{¶4} On January 25, 2012, Bell pled not guilty to the charges. (Doc. 15).

{¶5} On June 4-5, 2012, a jury trial was held. At the trial, the State called Detective Charles Boyer and Detective Matthew Armstrong, the detectives who conducted the controlled buy operation. The State also called Kelsey Degen, a

forensic scientist that tested the substances purchased during the controlled buys. She determined the substances to be cocaine. In addition, the State called Sandra Sandlin, who had set up the buy between the confidential informant and Bell. Sandra was present during the sale, which was conducted in her motel room, and Sandra was incarcerated for, *inter alia*, complicity to trafficking in cocaine for the incident related to this case.

**{¶6}** Bell's attorney cross-examined all witnesses but did not call any witnesses in Bell's defense. Ultimately Bell was found guilty of both counts of Trafficking in Cocaine in the vicinity of a juvenile.

**{¶7}** On June 5, 2012, the trial court proceeded to sentence Bell, sentencing him to 16 months in prison on each count, with those prison terms to be served consecutively for an aggregate prison term of 32 months.

**{¶8}** It is from this judgment that Bell appeals, asserting the following assignments of error for our review.

**ASSIGNMENT OF ERROR 1**
**THERE WAS INSUFFICIENT EVIDENCE INTRODUCED AT TRIAL TO SUPPORT THE FINDING THAT THE DEFENDANT WAS GUILTY OF TWO COUNTS OF TRAFFICKING IN COCAINE IN VIOLATION OF OHIO REVISED CODE SECTION 2925.03(A)(1),(C)(4)(b).**

**ASSIGNMENT OF ERROR 2**
**APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF HIS RIGHTS UNDER THE FIFTH, SIXTH, AND FOURTEENTH AMENDEMNTS OF**

**THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION.**

**ASSIGNMENT OF ERROR 3**
**IT WAS PLAIN ERROR FOR THE TRIAL COURT TO ALLOW THE ADMISSION OF THE STATE'S VIDEO RECORDING OF THE ALLEGED DRUG TRANSACTION.**

**ASSIGNMENT OF ERROR 4**
**THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT/APPELLANT IN MAKING STATEMENTS IN THE PRESENCE OF THE JURY WHICH DENIED THE DEFENDANT A FAIR TRIAL.**

{¶9} In the interest of clarity, we elect to address some of the assignments of error out of the order in which they were raised.

*First Assignment of Error*

{¶10} In Bell's first assignment of error, he argues that there was insufficient evidence to convict him of two counts of Trafficking in Cocaine. Specifically, Bell argues that the officers that testified did not actually see drug-for-money transactions, that there were other people in the room that could have made the drug sales other than Bell, and that the confidential informant could have already had the cocaine.

{¶11} The Supreme Court of Ohio has "carefully distinguished the terms 'sufficiency' and 'weight' in criminal cases, declaring that 'manifest weight' and 'legal sufficiency' are 'both quantitatively and qualitatively different.'" *Eastley v.*

*Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 10, quoting *State v. Thompkins*, 78 Ohio St.3d 380 (1997), paragraph two of the syllabus.

{¶12} The Ohio Supreme Court has set forth the sufficiency of the evidence test as follows:

> **An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial and determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.**

*State v. Jenks*, 61 Ohio St.3d 259 (1991), at syllabus, superseded by state constitutional amendment on other grounds as stated in *State v. Smith*, 80 Ohio St.3d 89 (1997); *Eastley*, *supra*, at ¶ 10; *Thompkins*, *supra*, at 386.

{¶13} Bell was convicted of two counts of Trafficking in Cocaine in violation of R.C. 2925.03(A)(1),(C)(4)(b), which reads as follows:

> **(A) No person shall knowingly do any of the following:**
>
> **(1) Sell or offer to sell a controlled substance;**
>
> **\* \* \***
>
> **(C) Whoever violates division (A) of this section is guilty of one of the following:**
> **(4) If the drug involved in the violation is cocaine or a compound, mixture, preparation, or substance containing cocaine, whoever violates division (A) of this section is guilty of**

**trafficking in cocaine. The penalty for the offense shall be determined as follows:**

**\* \* \***

**(b) Except as otherwise provided in division (C)(4)(c), (d), (e), (f), or (g) of this section, if the offense was committed in the vicinity of a school or in the vicinity of a juvenile, trafficking in cocaine is a felony of the fourth degree, and division (C) of section 2929.13 of the Revised Code applies in determining whether to impose a prison term on the offender.**

{¶14} To prove that Bell committed the offense of Trafficking in Cocaine, the State called four witnesses, beginning with Detective Charles W. Boyer ("Detective Boyer") of the Tiffin Police Department. Detective Boyer testified that he was assigned to the Seneca County Drug Task Force METRICH[1] Enforcement Unit. (Tr. at 104).

{¶15} Detective Boyer testified that a confidential informant that they had been using, Emily Davis[2] ("Emily"), contacted him and informed him of an impending cocaine purchase. (Tr. at 113). Emily had been working under an agreement that stated if she assisted law enforcement she could get felony charges against her reduced or dropped. (Tr. at 113-14).

{¶16} Detective Boyer testified that he "made arrangements to meet with [Emily] at a pre-determined location prior to the operation with additional agents."

---

[1] According to Detective Boyer's testimony, METRICH's mission "is to enforce the Ohio drug laws, to ensure the quality of life in our communities, such as Seneca County, specifically. (Tr. at 105).

[2] Detective Boyer testified that he knew Emily as Emily Wagner, but she was Emily Davis by marriage. (Tr. at 113).

(Tr. at 115). Detective Boyer testified that on May 10, 2011, he met up with Emily at the predetermined location along with Detective Matt Armstrong of the Fostoria Police Department. (Tr. at 115). According to Detective Boyer, he and Detective Armstrong then conducted "pre-operational protocol by searching the confidential informant, along with her vehicle." (Tr. at 115). Detective Boyer testified that no contraband was recovered as a result of those searches. (Tr. at 116).

{¶17} Detective Boyer testified that following the searches he placed an audio recording device and transmitter and a video recording device on Emily and found them to be working properly. (Tr. at 116). According to Detective Boyer, $100 in cover funds was issued to Emily to utilize in purchasing the cocaine. (*Id*.)

{¶18} Once Emily was searched and prepared for the operation, Detective Boyer testified that he and Detective Armstrong followed Emily's car straight to the Tiffin Motel, keeping Emily under audio surveillance.[3] (Tr. at 117). Detective Boyer testified that Emily stopped her car just to the right of room 32 in the Tiffin Motel. (Tr. at 118). Detective Boyer testified that he observed Emily arrive and walk up to Sandra, Sandra's children, and a maintenance man who were just walking up to the motel room. (Tr at 118). Detective Boyer testified that he then observed the group enter into the motel room, and that when they went in, he

---

[3] The video was recording but they were not monitoring it as they followed her.

could still overhear the conversation as a result of the audio recording device. (Tr at 119).

**{¶19}** Detective Boyer testified that shortly after the group entered the motel room, Bell arrived at the motel room and the maintenance man left. (Tr. at 119). Detective Boyer testified that he overheard what he thought was part of a drug transaction. (Tr. at 120). Detective Boyer testified that Emily then left the motel room, and Detectives Boyer and Armstrong followed her back to the predetermined meeting location. (Tr. at 121). Back at the location, Detective Boyer testified that he received contraband from Emily, a small baggie of white powder. (Tr. at 121). The Detectives placed the substance into an evidence bag, sealed it, and labeled it as evidence. (Tr. at 121-22). Detective Boyer testified that they then engaged in a second search of Emily and Emily's vehicle and found no contraband or covert funds. (Tr. at 122).

**{¶20}** According to Detective Boyer, the Detectives then issued $200 of covert funds to Emily and followed her back to the Tiffin Motel, observing her the entire time. (Tr. at 135). Detective Boyer testified that Emily again entered Room 32, and that he could hear the conversation between Emily and Sandra and Bell due to the audio device. (Tr. at 137-38). Detective Boyer testified that there was a brief conversation and then afterward Emily and Bell separately left the motel room. (Tr. at 138).

**{¶21}** Detective Boyer testified that when Emily left the motel, he and Detective Armstrong followed her back to the pre-determined location and that they then conducted post-operational protocol by receiving a second package of suspected cocaine, packaging and labeling it as evidence. (Tr. at 139). Detective Boyer testified that he and Detective Armstrong then searched Emily's body and her car and removed all of the audio and video surveillance equipment. (Tr. at 139).

**{¶22}** During Detective Boyer's testimony, the State played the video recordings that had been made of the alleged transactions. In the video of both transactions, Emily, Sandra, Bell, the maintenance man and at least two small children are present inside the motel room. (State's Exs. 2, 7). In the first video, Bell shows up after all of the others are already in the room, roughly sixteen minutes into the video. (State's Ex. 2). In the second video, Bell is in the motel room when Emily arrives. (State's Ex. 7).

**{¶23}** On cross-examination, Detective Boyer admitted that he did not search inside Emily's bra or underwear. (Tr. at 162). Detective Boyer also admitted that he did not search the trunk of the car Emily was driving, arguing that she would not be accessing the trunk, and that she did not, in fact, access the trunk. (*Id.*)

{¶24} The State next called Kelsey Degen, a forensic scientist for the Ohio Bureau of Criminal Identification and Investigation (BCII). Degen was qualified as an expert in scientific analysis of controlled substances, including weight and identification. (Tr. at 219-20). Degen testified that she tested the two suspected drug samples submitted in this case and found the sample from the first transaction to be .9 grams of cocaine and the sample from the second transaction to be 1.2 grams of cocaine. (Tr. at 227, 230).

{¶25} The State then called Sandra Sandlin ("Sandra"). Sandra testified that at the time of the incident on May 10, 2011, she had known Bell for two or three weeks. (Tr. at 254). Sandra testified that Bell had let her know that he had cocaine and Bell had told Sandra to let Bell know who was buying. (Tr. at 255). Sandra testified that Emily called and asked about cocaine. (Tr. at 255). Sandra testified that she informed Emily that Emily could come to where Sandra was, in Room 32 at the Tiffin Motel, to purchase cocaine. (Tr. at 256). Sandra testified that she was staying at the Tiffin Motel with her children Danelle and Trenton, who were roughly four years old and eighteen months old at the time. (Tr. at 256).

{¶26} Sandra testified that she was taking care of her children on May 10, 2011, when Emily came to purchase cocaine from Bell at the motel, and that Bell did sell cocaine to her. (Tr. at 257). Sandra testified that she did not have the cocaine in her room, that Bell brought it. (*Id.*) Sandra testified that she personally

witnessed Bell have the cocaine the first time, but the second time she did not see it. (*Id*.) Sandra testified that during the first transaction, Bell went into the bathroom in the motel room and came out and exchanged the cocaine for money. (Tr. at 258). Sandra testified that she overheard Emily speaking with Bell, and Emily said to Bell that she was going to get some money from some friends and come back to purchase more. (Tr. at 259). Sandra testified that Bell told Emily he would wait for her to come back. (*Id*.)

{¶27} Sandra testified that Emily left after the first transaction and came back about half an hour to an hour later. (Tr. at 259). Sandra testified that Bell stayed in her room during that time. (*Id*.) Sandra testified that when Emily returned, Bell went back to the same spot in the bathroom and Emily purchased more cocaine. (Tr. at 260). Sandra testified that Emily and Bell left her room at approximately the same time. (*Id*.)

{¶28} According to Sandra, there was a motel employee around her room during the time of the transactions, a man she knew as "Frog." Sandra testified that Frog brought Sandra some silverware and a bowl to eat soup with. (Tr. at 260). Sandra testified that this man did not sell drugs to her or Emily. Sandra testified that Bell sold cocaine to Emily twice on May 10, 2011, and that she was present for both sales. (Tr. at 261). Finally, Sandra testified that she was in prison for those two cocaine sales that she set up between Bell and Emily. Sandra

testified that she was in prison for Complicity to Trafficking in Cocaine, and Permitting Drug Abuse and a specification. (Tr. at 263).

{¶29} As its final witness, the State called Detective Matt Armstrong. Detective Armstrong testified that he had worked for the Fostoria Police Department for 6 years and was part of the Seneca County Drug Task Force at the time of these incidents. (Tr. at 279). Detective Armstrong testified that he participated in the search of Emily and her vehicle both before and after each controlled buy operation. (Tr. at 281). Detective Armstrong testified that he was in the vehicle following Emily to and from the Tiffin Motel, monitoring her through the audio surveillance. (Tr. at 281). Detective Armstrong also testified that he transported the suspected cocaine once it was collected and tagged to BCII. (Tr. at 284). At the conclusion of Detective Armstrong's testimony, the State rested its case.

{¶30} On appeal, Bell argues that the evidence presented did not establish that Bell sold the cocaine rather than the other man who was present in the room around the time of both transactions, or Sandra. Bell also argues that Emily could have had the cocaine on her person in the areas that weren't searched, such as in her bra or underwear.

{¶31} Despite Bell's arguments, Sandra testified that she set up the cocaine sales between Emily and Bell, that she was present for both of the sales, and that

neither she nor "Frog" (the maintenance man) sold the cocaine. Sandra also testified that the children were present at the time of the sale in the motel room. The video from the first transaction corroborates Sandra's testimony in that Emily gets to the motel and waits for Bell, Bell arrives and goes into the bathroom, comes out, interacts with Emily, and then Emily leaves. (State's Ex. 2). The maintenance man could also be heard on the video speaking with Sandra about bowls and food. (*Id.*) The second video, much shorter than the first, shows Emily arriving, Bell going back into the bathroom, coming out, and then Emily leaving. (State's Ex. 7).

{¶32} In addition to Sandra's testimony and the video, the jury heard testimony from both Detective Boyer and Detective Armstrong who both testified that they searched Emily's person and her car and found nothing prior to and after each transaction. They testified that they gave Emily money and followed her to the Tiffin Motel, and on both instances on May 10, 2011, Emily came out of the motel with no money and small baggies of suspected cocaine. The white substances were tested and found to be cocaine. Based upon the foregoing evidence presented at trial, we find that there was sufficient evidence to convict Bell of two counts of Trafficking in Cocaine in the vicinity of a juvenile. Accordingly, Bell's first assignment of error is overruled.

*Third Assignment of Error*

**{¶33}** In Bell's third assignment of error, Bell argues that it was plain error for the trial court to allow the admission of the State's video recordings of the alleged drug transactions. Specifically, Bell claims that the videos were not properly authenticated.

**{¶34}** We recognize plain error "'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" *State v. Landrum*, 53 Ohio St.3d 107, 110 (1990), quoting *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus. For plain error to apply, the trial court must have deviated from a legal rule, the error must have been an obvious defect in the proceeding, and the error must have affected a substantial right. *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). Under the plain error standard, the appellant must demonstrate that the outcome of his trial *clearly* would have been different but for the trial court's errors. *State v. Waddell*, 75 Ohio St.3d 163, 166 (1996), citing *State v. Moreland*, 50 Ohio St.3d 58, 62 (1990). The burden of demonstrating plain error is on the party asserting it. *See generally State v. Jester*, 32 Ohio St.3d 147, 150 (1987).

**{¶35}** To be admissible, a tape recording must be "'authentic, accurate and trustworthy.'" *State v. Coleman*, 85 Ohio St.3d 129, 141 (1999), citing *State v. Rogan*, 94 Ohio App.3d 140, 148 (2nd Dist.1994). Ohio Evidence Rule 901(A)

states that the requirement for authentication or identification "as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Evid.R. 901(A).

{¶36} Evidence Rule 901(B) states that

**By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule:**

*(1) Testimony of witness with knowledge.* **Testimony that a matter is what it is claimed to be.**

**\* \* \***

*(5) Voice identification.* **Identification of a voice, whether heard firsthand or through mechanical or electronic transmission or recording, by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker.**

{¶37} On appeal, Bell argues that the videos of the scene of the transaction were not properly authenticated since Emily, the confidential informant, did not testify. The State counters by arguing that Detective Boyer testified that he placed the audio and video recording devices on Emily and that they were working properly. Detective Boyer and Detective Armstrong testified that they were listening to the audio during the controlled buy operations. Detective Boyer testified that he created the video, had reviewed it, that it was not tampered with and that it was a true and accurate copy. Detective Boyer also testified that he identified the people on the videotape. (Tr. at 120).

{¶38} Detective Boyer's testimony is certainly sufficient to authenticate the audio and the video tapes. However, even if the video was not properly authenticated, Bell makes no argument establishing how the inclusion of the video prejudiced him. Bell merely states "[s]ince the confidential informant did not testify in this case the issue of guilt or innocence hinged primarily on the video recordings. Had the video recordings not been admitted certainly the outcome of the trial would have been different." (Appt. Br. at 15).

{¶39} It is not at all clear in this case how the outcome of the trial would have been different if the videos were not admitted into evidence. First, Bell's trial counsel used the videos himself to establish that no drug transactions were visible on the videos, and that there were minutes on the video when the confidential informant was alone in the car while driving where she could have produced the cocaine from a private, unsearched area. Bell's counsel also used the tapes to show that "Frog" was around the motel room near the time of the sales. In trial counsel's closing argument, he encouraged the jury to re-watch the video as there was no proof of a transaction on the video.

{¶40} Absent this video evidence, Bell is still faced with the testimony of Sandra, who testified adamantly that she set up the cocaine transactions between Bell and Emily, was present during both transactions, and was incarcerated for doing so. Sandra unequivocally testified that the other man in the room had

nothing to do with the transactions. In addition, the circumstantial evidence of Bell's arrival at the motel room, Emily's subsequent possession of the cocaine and lack of money is evidence that the jury could use to convict Bell. Without any argument from Bell to the contrary in his brief, it is unclear how the video did anything to hurt his case, especially given that defense counsel's trial strategy heavily relied upon it. We cannot find under these circumstances that any plain error is present given the evidence against Bell with or without the video.

{¶41} Finally, the Second District Court of Appeals was presented with a similar issue in *State v. Gilliam*, 2nd Dist. No. 09CA0075, 2011-Ohio-26, ¶ 16. In that case, the Second District conducted the following analysis:

> **Defendant objected that the video was inadmissible absent the testimony of the informant shown in it. The trial court admitted the video pursuant to Evid.R. 901(B)(5) because the two officers could identify the voices heard on it. Defendant did not object that the video was not admissible pursuant to Evid.R. 901(B)(5) because the state failed to offer foundational evidence of its accuracy. Therefore, any error in admitting the evidence for that reason is forfeited. *State v. Payne*, 114 Ohio St.3d 502, 2007-Ohio-4642, 873 N.E.2d 306. Criminal plain error is not shown. *State v. Long*, 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804.**

*Gilliam*, at ¶ 16. Thus under the reasoning employed in *Gilliam*, Bell's claim is forfeited in any event.

{¶42} For all of these reasons, Bell's third assignment of error is overruled.

*Fourth Assignment of Error*

**{¶43}** In Bell's fourth assignment of error, Bell argues that the trial court made statements in the presence of the jury that denied Bell a fair trial.

**{¶44}** Under Evid.R. 611(A), the trial court has discretion to control the flow of the trial. Our review of a trial court's comments must determine whether the trial court abused that discretion. *State v. Heuser*, 3d Dist. No. 5-04-10, 2004-Ohio-5345, ¶ 6, citing *State v. Davis*, 79 Ohio App.3d 450 (4th Dist.1992). "We must determine whether the trial court, through its statements at trial, conveyed its opinion regarding the quality of evidence." *Heuser*, at ¶ 6, citing *State ex rel. Wise v. Chand*, 21 Ohio St.2d 113, 119-120 (1970).

**{¶45}** The Ohio Supreme Court has articulated a five part test to determine whether a trial judge's actions and remarks are so prejudicial as to violate a criminal defendant's constitutional rights:

> **(1) The burden of proof is placed upon the defendant to demonstrate prejudice, (2) it is presumed that the trial judge is in the best position to decide when a breach is committed and what corrective measures are called for, (3) the remarks are to be considered in light of the circumstances under which they are made, (4) consideration is to be given to their possible effect upon the jury, and (5) to their possible impairment of the effectiveness of counsel.**

*Hauser*, *supra*, at ¶ 7, citing *State v. Wade*, 53 Ohio St.2d 182, 188 (1978), and *State v. Hopfer*, 112 Ohio App.3d 521, 537 (2nd Dist.1996).

**{¶46}** "Moreover, that Court made clear that '"the failure to object ... constitute[s] a waiver of the error ..., for, absent an objection, the trial judge is denied an opportunity to give corrective instructions as to the error."' *Id.*, citing *State v. Williams*, 39 Ohio St.2d 20 (1974), *State v. Childs*, 14 Ohio St.2d 56 (1968); *Smith v. Flesher*, 12 Ohio St.2d 107 (1967).

**{¶47}** On appeal, Bell cites the following exchange between the trial court and defense counsel while defense counsel was cross-examining Sandra, as being inappropriate and prejudicial:

> **Q:   And how much time could you have served if you had gone to trial and lost and been convicted and got a maximum sentence?  Do you remember that?**
> **A:   [Sandra]: Uhm, well, I got the 23 months so I'm thinking it – I just remember the 23 months.**
> **Q:   So but you're gonna be out in 70 days, right?**
> **A:    No.  I just came back to come to this court.**
> **Q:   So you pled to 23 months?**
> **A:   Yeah.**
> **THE COURT:  Let me – the court always has problem with defense counsel.  You don't plead to 23 months.  You plead guilty to charges.  The Court sentences.  So if you want to rephrase the question you may do so, but I want the vernacular to be proper.**
> **[DEFENSE COUNSEL]:   I will rephrase, Your Honor.   I apologize.**

(Tr. at 263-64).

＊ ＊ ＊

> **[DEFENSE COUNSEL]:  Uhm, Your Honor, I wanna go back to the uhm, Plea Agreement, uhm, with Ms. Mason – Ms. Sandlin**

**seems to be having a problem remembering.  Uhm, I have a copy of that.  May I?**
**[THE COURT]:  Well, first of all, whether she has a problem remembering or not is not for your determination, all right?  It's for the jury.  So without your comment, which I'm gonna strike from the record, you may proceed.**
**[DEFENSE COUNSEL]:  Yeah, I apologize, Your Honor.  I had no intention of misleading –**
**[THE COURT]:  You may proceed.**
**[DEFENSE COUNSEL]:  Thank you.**
**[THE COURT]:  But I caution counsel, as I always do, both counsel, a plea of guilty is not a sentence.  Sentence comes from the Court and is in a sentencing entry.  Just so both counsel are clear here.**
**[DEFENSE COUNSEL]:  Thank you, Your Honor.**
**[THE COURT]:  I don't care what a plea of guilty may say.**

(Tr. at 269-70).

**{¶48}** Bell argues that these exchanges between Bell's counsel and the trial court showed bias or at least the appearance of bias in favor of the State and against Bell's counsel.  Bell further contends that the preceding statements diminished the weight jurors otherwise would have given to the evidence.

**{¶49}** With regard to the preceding exchanges, defense counsel did not object and therefore waived this argument on appeal.  However, had defense counsel objected, we still do not find that the statements made by the court prejudiced Bell.  The trial court merely wished to clarify the words associated with a plea agreement and sentencing.  The court in no way prevented defense counsel from questioning Sandra on the agreement.  Similarly the court did not comment or indicate what weight it should be given.  Moreover, in the court's final

-20-

statement on the matter cited above, the court addresses both defense counsel *and* the State, indicating that what the court was saying applied to both. Under these circumstances, we find no prejudice.

{¶50} We further note that the trial court made a curative statement to the jury in its final instructions:

> **If, during the course of this trial, I said or did anything which you consider an indication of my view on the facts, you are instructed to disregard it. The Judge must be, and sincerely desires to be, impartial in presiding over this and every other trial before a jury and without a jury. The Court does not have the right, and does not desire to invade the province of the jury, by indicating in any way a preference between the State and the defendant and, the Court has not done so at any time.**

(Tr. at 336). Thus even if counsel had objected, and even if the statements of the court could be considered prejudicial, the court gave a curative instruction to the jury, and jurors are presumed to follow that instruction. *State v. Downing*, 9th Dist. No. 22012, 2004-Ohio-5952, at ¶ 51. For all of the foregoing reasons, Bell's fourth assignment of error is overruled.

*Second Assignment of Error*

{¶51} In Bell's second assignment of error, he argues that his trial counsel was ineffective for failing to object to "substantial" amounts of hearsay evidence and for failing to object to the introduction of the videos of the alleged drug transactions that were presented to the jury at trial.

{¶52} "Reversal of convictions on ineffective assistance requires the defendant to show 'first that counsel's performance was deficient and, second that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial.'" *State v. Cassano*, 96 Ohio St.3d 94, 2002-Ohio-3751 at ¶105, quoting *Strickland v. Washington*, 466 U.S. 668, 669, 104 S.Ct. 2052 (1984). When considering a claim of ineffective assistance of counsel, the court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

{¶53} A tactical decision by trial counsel, who as a licensed attorney is presumed to be competent, is not by itself enough to show ineffective assistance of counsel simply because the strategy did not result in an acquittal. *State v. Clayton*, 62 Ohio St.2d 45, 48-49 (1980); *State v. Timm*, 3d Dist. No. 13-11-23, 2012-Ohio-410, ¶ 31. "Furthermore, trial counsel's failure to object is generally viewed as trial strategy and does not establish ineffective assistance." *State v. Turks*, 3d. Dist. No. 1-08-44, 2009-Ohio-1837, ¶ 43, citing *State v. McKinney*, 11th Dist. No. 2007-T-0004, 2008-Ohio-3256, ¶ 191; *State v. Gumm*, 73 Ohio St.3d 413, 428; *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, ¶ 103.

{¶54} In arguing that his counsel was ineffective, Bell first contends on appeal that his counsel failed to object to inadmissible hearsay evidence. Hearsay is defined as "a statement, other than one made by the declarant while testifying at

the trial or hearing, offered in evidence to prove the truth of the matter asserted."

Evid.R. 801(C). Hearsay is generally not admissible unless an exception applies.

Evid.R. 802.

{¶55} Bell points to the following testimony as being inappropriate:

**Q: [STATE]: While the informant was on her way to the Tiffin Motel, could you hear whether she had any further contact with Ms. Sandlin or Ms. Mason?**

**A: [Detective Boyer]: Uhm, yes. She received, uhm – or she contacted, uhm –the confidential informant contacted Mason, uhm, Sandlin and explained, uhm, and confirmed what room she was gonna be in and it was room 32, which we already knew that.**

(Tr. at 117-118).

{¶56} In this excerpt of testimony, the State was questioning Detective Boyer about whether Emily, the informant, had any contact with Sandra during the ride over to Sandra's hotel room. Detective Boyer was monitoring Emily visually by following in a car behind her, and also listening to the audio device he had placed in her car. Detective Boyer testified that he overheard a conversation between Emily and Sandra on that drive to the motel via the audio equipment.

{¶57} We would note that this excerpt of testimony was not offered to prove the truth of the matter asserted in this case and thus would not be hearsay. It merely explains why the officers proceeded to the motel. However, even if the evidence did go to prove the truth of the matter asserted, there is no resulting

prejudice from this particular excerpt of testimony. Numerous times throughout the trial it was mentioned that the purported transaction took place in room 32 of the Tiffin Motel. Detectives Boyer and Armstrong testified to that fact, as did Sandra. Therefore, Bell cannot make a valid argument that this statement, if it was even hearsay, which we do not find, was in any way prejudicial.

{¶58} Bell next argues that the following exchange between the State and Detective Boyer was improper:

> **Q:     [State]:  And the conversations that the defendant had, were you able to determine if any drug sales were occurring?**
> **A:     [Detective Boyer]:  Yes.**
> **Q:     Based on what?**
> **A:     Me overhearing the conversation prior to, uhm, the arrival of the defendant.  Uhm, the confidential informant was asking Sandlin, uhm, that "Does he have it?" uhm, "When is he gonna be here" and so forth.  Uhm, and then once he got there that conversation was no longer and, uhm, it was just, you know, pretty much brief conversation at that point until I seen the video after the buy of what happened.**

(Tr. at 120).

{¶59} Bell contends that Detective Boyer's elaboration regarding what he overheard on the audio between Emily and Sandra constituted inadmissible hearsay. While the statement "Does he have it?" may have constituted hearsay, it is unclear how failing to object to this statement would have so prejudiced Bell that it deprived Bell of a fair trial. Sandra testified that when Emily arrived Emily waited around a little while before Bell came to the motel room for the first

-24-

transaction because Bell was not yet present. (Tr. at 257). Sandra also testified that Bell had the cocaine on him because Bell told Sandra this and she saw the cocaine during the first transaction. (*Id.*) Thus any hearsay statement elicited was merely cumulative to other testimony presented at trial, and did not prejudice Bell.

{¶60} Finally, Bell argues that trial counsel was ineffective for failing to object to the admission of State's Exhibits 2 and 7, the videos of the two alleged drug transactions. We found in the third assignment of error that if there was any error in admitting the videos into evidence it did not rise to the level of plain error as the outcome would not have been different in this case. Accordingly, Bell cannot sustain an ineffective assistance of counsel claim on this issue. In addition, we would point out that a review of the transcript reveals that trial counsel was attempting to make an effective case through using the video recordings to show that another man was present and could have potentially made the drug sales to Emily, as he was in both videos. No drug sale is actually visible on the video, thus allowing trial counsel to make this argument in an attempt to establish reasonable doubt. Under these circumstances, trial counsel's "failure to object" appears to have been a clear and reasonable trial strategy. Thus we do not find counsel's performance deficient or that it prejudiced Bell in any way. Accordingly, Bell's second assignment of error is overruled.

{¶61} For the foregoing reasons Bell's assignments of error are overruled and the judgment of the Seneca County Common Pleas Court is affirmed.

*Judgment Affirmed*

**PRESTON, P.J., concurs.**

**/jlr**

**ROGERS, J. Concurring Separately.**

{¶62} I concur with the opinion of the majority, however, write separately to express two concerns with respect to the trial court's findings and sentence.

{¶63} First, when imposing consecutive sentences the trial court is required to make certain findings. R.C. 2929.14(C)(4). Here, the trial court made several findings which, together, are sufficient to sustain the imposition of consecutive sentences. However, one of the findings by the trial court was clearly unwarranted.

{¶64} Specifically, R.C. 2929.14(C)(4) states:

If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:

(a)   The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b)   At least two of the multiple offenses were committed as part of one or more courses of conduct, *and the harm caused* by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c)   The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.  (Emphasis added.).

**{¶65}** In its judgment entry, the trial court found, in relevant part, that the "harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the defendant's conduct."  Judgment Entry, p. 3.  Because this was a controlled buy and the drugs at issue were never outside the control of the police, there is no conceivable way that any harm was caused to anyone. *State v. Watkins*, 3d Dist. No. 1-04-17, 2005-Ohio-2359, ¶ 29-35 (Rogers, J., concurring separately). Accordingly, the trial court's erroneous finding was clearly unjustified and unsubstantiated.  Despite this error, the trial court did make findings as to the Appellant's criminal history, which was sufficient to permit the trial court to impose consecutive sentences.  As such, the error was harmless.

**{¶66}** The second problem I have with the sentence imposed is the trial court's imposition of a *mandatory* fine. There are two issues here. First, the trial court stated that it was imposing a mandatory fine in lieu of restitution. Restitution to whom and for what? Again, we have a controlled buy and there is no victim. *See State v. Dietrich*, 3d Dist. No. 1-10-76, 2011-Ohio-4347, ¶ 31 (law enforcement agency advancing own funds in a control drug buy is not a victim). Despite the trial court's mischaracterization, the fine, as the trial court indicates in its sentencing entry, is permissible pursuant to R.C. 2925.42.

**{¶67}** Secondly, there is no authority for the trial court to impose a mandatory fine for a fourth degree felony drug offense. While mandatory fines are authorized for first, second, and third degree felony drug offenses, R.C. 2925.03(D)(1), there is no provision for them with respect to fourth degree felony drug offenses. The fact remains, however, that the trial court does have the authority to impose fines for fourth degree felony drug offenses, so the fine may stand, absent the classification as mandatory. R.C. 2925.42; R.C. 2929.18(A)(2), (B)(4).